THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EUGENE WONG, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARY WONG, APPELLANT.

First Department, August 6, 1992

### APPEARANCES OF COUNSEL

*Jonathan Marks* of counsel *(Henry J. Steinglass* with him on the brief; *Power, Weiss & Marks,* attorneys), for appellants.

*Mary C. Farrington* of counsel *(James M. McGuire* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

Per Curiam.

On June 26, 1988 the parents of three-month-old Kwok-Wei Jiang responded to an advertisement run by defendant Mary Wong in a New York Chinese language newspaper for a 24-hour babysitting service. The Jiangs, who both worked 12 hours a day, Monday through Saturday, visited the defendants' one-bedroom apartment on East 93rd Street and gathered information about the service. They were told that the baby would be cared for primarily by defendant Mary Wong, who held herself out as a nurse who had previously worked in Hong Kong, but that the child would also receive care from her husband, defendant Eugene Wong, who was employed by the United Nations as a statistician. The baby would sleep in a crib directly next to the defendants' bed. Also living in the

apartment was the Wongs' three-year-old son, Andrew, who appeared to be well cared for. The apartment was clean and neat and the Jiangs were sufficiently impressed with the arrangements so as to leave their infant in defendants' care. On the next Sunday, July 3, they visited their baby and, though they found him to be somewhat subdued, were not so concerned as to terminate the relationship.

On July 7, 1988, between 6:00 and 6:30 A.M., Mary Wong called Mr. Jiang and told him that his baby was dead. She stated that the baby had cried continually from midnight until 2:00 A.M., that later he was fed some "gripe water" (a dietary supplement which Mrs. Jiang had obtained from a Chinese pharmacy and given to defendants), and went to sleep. At that point both defendants went to sleep. When they awakened, the child had turned black. Mrs. Wong asked that Mr. Jiang come over to her apartment, but Mr. Jiang, who could scarcely believe what he had heard, instead tried to get in touch with his wife, who was working in New Jersey.

At 6:20, Eugene Wong placed a call to 911, requesting an ambulance for an unconscious child. Police Officers Burdett and Lopez immediately responded. When they arrived, both Mr. and Mrs. Wong were fully dressed, and both were noticeably calm. Mr. Wong, who had answered the door, told them he had called for an ambulance, not the police. He allowed them into the apartment and there, five feet from the front door, the officers observed a baby carrier holding Kwok-Wei Jiang. The officers could see that the baby, who was stiff and whose face was discolored, was already dead. The baby's legs were stiffly flexed in a manner conforming to the carrier. Downstairs, they gave the child to the paramedics, who had just arrived. According to paramedic Barbara Taylor, the child was cyanotic, i.e., blue from lack of oxygen, and rigor mortis had already set in.

At the hospital, Eugene Wong informed the paramedics that he and his wife had fed the baby, who had not been sick, at 1:00 or 2:00 A.M. and the child had quieted down. In the morning his wife had checked the baby and found that he was not breathing. Mr. Wong also spoke to the doctor, reporting that Kwok-Wei had awakened at midnight and cried for a long time and that both he and his wife had "attended the baby to see what was wrong." The child, who did not have diarrhea, vomiting, or fever, took no food, but, after 2 to 2½ hours, had stopped crying and "went to bed". At that point defendants had also gone to bed. At 6:00 A.M. one of them (the doctor did

not recall which one) checked the baby and found that he was not breathing and had no heartbeat.

At the hospital, Officer Lopez called Mrs. Wong, who had remained at home with her son, to find out the baby's name and age, which Mr. Wong had not known. In addition to supplying the requested information, Mrs. Wong gave the officer the baby's parents' telephone number and informed the officer that the defendants had been caring for the baby for 10 days and that he had been sleeping in the bedroom. She then asked if the baby had died, and Lopez told her that it had. Lopez then called Mr. Jiang but was unable to communicate with him because of his limited English. Lopez therefore called Mrs. Wong back and asked her to call Mr. Jiang to inform him of what had happened. According to Mr. Jiang, when Mrs. Wong called him it was approximately one hour after the original call. She asked him why he had not come over, and he said he had been unable to locate his wife. He then asked if his child was really dead, and this time Mrs. Wong stated that she did not know, and informed him that the child had been taken to the hospital in an ambulance. Mr. Jiang then reached his wife at work and they both went to the hospital.

That night Mrs. Wong called Mrs. Jiang and told her that she and her husband had been up with the baby in the living room from midnight until he finally fell asleep at about 2:00 or 2:30 A.M. She tried to feed him milk and water but he would not accept either, but she finally gave him some gripe water. When he finally fell asleep they brought him into the bedroom and also went to sleep. Mrs. Jiang asked Mrs. Wong why, if the baby was crying so much, she had not taken him to the hospital, and Mrs. Wong replied that nothing appeared to be wrong with the baby and if she had taken him to the hospital the doctor would have "scold[ed]" her. When she awakened in the morning the baby's face had turned black. In a later conversation however, Mrs. Wong told Mrs. Jiang that she had seen that the baby had had "cramps" and had been "shaking involuntarily." Mrs. Wong informed Mrs. Jiang that the probable reason for these symptoms was that Mrs. Jiang had used birth control pills or had taken Chinese herbal medicine.

An autopsy was performed on July 9, 1988. It was determined that Kwok-Wei had died of various internal injuries to the brain, including rupture of the blood vessels causing subdural hematoma. There were no signs of external injury to

the skull and it was undisputed that the injuries could be attributed solely to "shaken baby syndrome," a type of injury occasionally seen in children under one year old and caused solely by the accelerating and decelerating forces to which the child would be subjected as a result of having been violently shaken. The baby also had two confluent bruises on the upper buttocks which were unrelated to the head injuries and did not contribute to his death. These bruises, which were the only outwardly visible signs that the baby had been abused, had been caused by a blow administered within 24 hours of death.

On the same day that the autopsy was conducted, the defendants were arrested. At the time of his arrest, Mr. Wong spontaneously suggested to the arresting officer that Andrew, his three-year-old son, had caused the baby's death, stating, "[Y]ou're going to find out that he [Andrew] was involved, that he did it, he's like a little Rambo".

Evidence was also introduced at trial concerning two other infants who, while in the Wongs' care, had suffered injuries requiring hospitalization. In March 1988, 18-month-old Kevin Hung, when taken by his father to the hospital after spending a month with the Wongs, was found to have a second degree burn on the sole of his foot, bruises on his face and body, and fractures, one recent and one several weeks old, in each leg. As a result, he was hospitalized for 13 days. Earlier, on a visit, Kevin's father had observed a burn on the child's mouth, but had dismissed it as an accident when Mrs. Wong told him that Kevin had tried to taste some hot soup which she had left out to cool. In June of 1988, shortly before Kwok-Wei Jiang came into the Wongs' care, 1½-month-old Jenny Chan was taken to the hospital by her father when he visited her at the Wongs' and saw that her face was badly discolored and that she was completely unresponsive. Mrs. Wong claimed that she had found the baby in that condition when she awoke and suggested that it was due to an "internal problem." Jenny was hospitalized for three days.

Both defendants were indicted on counts of manslaughter in the first degree. (Penal Law § 125.20 [1]—with intent to cause serious physical injury to another causes the death of such other), manslaughter in the second degree (Penal Law § 125.15 [1]—recklessly causes the death of another) and endangering the welfare of a child (Penal Law § 260.10 [1]—knowingly acting in a manner likely to be injurious to the physical, mental or moral welfare of a child). After a trial during which

the defense sought to attribute the infant's death to an accident at the hands of their three-year-old son, both defendants were convicted of each of the aforementioned counts in the indictment.

■ As a threshold matter, we reject defendants' argument that the jury's finding that the death of Kwok-Wei was not accidental was against the weight of the evidence. In that regard the expert testimony ruled out the possibility, raised by defendants, that the injuries could have been inflicted by the Wongs' three-year-old son and, indeed, defendants have not pursued that argument on appeal. Moreover, we find that the prosecution's expert testimony overwhelmingly demonstrated that these injuries could not have been inflicted upon the infant without the awareness and conscious disregard that they created a substantial and unjustifiable risk of death (Penal Law § 15.05 [3]; § 125.15 [1]). The dissent points to certain expert testimony which, standing on its own, indicates that an infant could be innocently shaken so hard as to cause death. However, the jury, when confronted by varying expert testimony, is entitled to accept that testimony which it finds to be credible and reject that which it does not. In this case, we find that the jury's verdict was fully justified by that testimony which compellingly showed that, in order to cause the injuries inflicted here, it was necessary for the perpetrator to shake the three-month-old infant in such a violent manner as to make obvious to a reasonable person that there was a substantial risk of death. Such testimony included the opinion of one medical expert that the shaking had to be "severe" and "repeated" as well as conducted with "very substantial force" and the testimony of another that the force involved in whipping the child's head back and forth must be "very considerable" or "violent." The jury was fully entitled to accept this testimony and reject that which indicated that the injuries did not give rise to the inference of reckless disregard of death. Indeed, as one expert testified, if death could be inflicted easily in this manner, shaken baby syndrome would be a very common, rather than an extremely rare, cause of death, as infants are frequently subjected to accidents and falls or even playful tossing which cause the type of whiplash movement of the head involved in the syndrome but which are very seldom severe enough to cause the trauma which leads to death.

Thus, the nature of the injury itself, when seen in the light of the expert testimony, fully supports the jury's finding that

the child's death was not an accident and was a result of the culpable act of one of the defendants. Moreover, further support for the prosecution's argument that these injuries were not accidentally caused is provided by the evidence that Kwok-Wei had a deep bruise on his lower back as well as by the fact that other children entrusted to the Wongs' care had been subjected to abuse (see, People v Sims, 110 AD2d 214, lv denied 67 NY2d 657).

However, while the evidence overwhelmingly demonstrates the existence of a criminally reckless disregard of a risk of death, which is the culpable mental state required for a conviction of manslaughter in the second degree, with respect to the count of manslaughter in the first degree we find that, insofar as the jury necessarily went further and found that the shaking of the infant was inflicted with the intent to cause serious physical injury to him, its verdict was against the weight of the evidence. We note that, since we do not find that the jury was irrational in drawing the permissible inference from the shaking and the failure to seek medical care that the defendants intended the baby's injury as the natural and probable consequence of their conduct, we cannot agree with the dissent that the evidence of intent was insufficient as a matter of law (see, People v Steinberg, 79 NY2d 673, 682-683). However, under the circumstances of this case, and particularly in view of the evidence indicating that the probable intention on the part of the person who shook the child was to quiet him, regardless of the consequences, and not necessarily to harm him, we find that a reasonable doubt exists as to whether this inference, standing alone as evidence of intent, is sufficiently strong to support the verdict and therefore find that this finding was against the weight of the credible evidence. Accordingly, the verdicts finding each defendant guilty of manslaughter in the first degree cannot stand.

With respect to the remaining convictions of manslaughter in the second degree and endangering the welfare of a child, defendants' primary argument on appeal is that their convictions must be vacated in toto since, regardless of the evidence establishing the culpability of the person who shook the child, the evidence was insufficient as a matter of law to establish that each was individually culpable.

The test for review of the sufficiency of a conviction based solely on circumstantial evidence is that the conclusion of guilt must be consistent with and flow naturally from the proven facts, and that those facts viewed as a whole must

exclude to a moral certainty every conclusion other than guilt *(People v Kennedy,* 47 NY2d 196). In this case, since the incident occurred while the baby was in the sole control of defendants in their home, with no one else present other than their three-year-old child, no specific proof could be obtained as to which defendant actually shook the baby. Thus, there could be no basis upon which to proceed against either defendant individually on the theory that he or she physically committed the homicidal act.

■ However, while criminal liability will normally be imposed only for a defendant's culpable act, it may also be imposed when a defendant, with the requisite mental culpability for the crime charged—in this case, recklessness—fails to perform an act as to which a duty of performance is imposed by law *(see,* Penal Law § 15.00 [3]; *see also,* discussion in *People v Gladden,* 118 Misc 2d 831). There is no question that the contractual babysitting agreement involved in this case, as well as the voluntary assumption of complete and exclusive care of a helpless child, created legal duties of care which were substantially coextensive with those which would be borne by a parent *(see generally, People v Salley,* 153 AD2d 704, *lv denied* 75 NY2d 817; Annotation, *Homicide—Lack of Medical Attention,* 100 ALR2d 483, §§ 10, 18; 1 LaFave and Scott, Substantive Criminal Law § 3.3 [a] [3] [2d ed]). These clearly included the duties which the defendants were charged with breaching, i.e., the duty to provide necessary emergency medical care *(see, People v Steinberg,* 79 NY2d 673, 680, *supra; People v Northrup,* 83 AD2d 737) as well as the duty to protect the child, if possible, from physical harm. Moreover, it is clear that in this case, both defendants legally owed such duties to the infant. Although Mrs. Wong was meant to be the primary caretaker, both defendants contractually assumed responsibility for the child's care at the time the babysitting arrangement was entered into. Further support for this conclusion is found in the fact that, according to both defendants' statements, on the night of Kwok-Wei's death, Eugene Wong was just as involved in "attending to" the crying child as was his wife. Under these circumstances, the prosecution was obliged to establish that the evidence excluded beyond a reasonable doubt any conclusion other than that each defendant was guilty, either by commission for having actually shaken the child, or by omission for failing to protect the child who was entrusted to his or her care.

■ Defendants' related arguments concerning the allegedly

duplicitous nature of the indictment and the charge to the jury are not preserved for review and we see no reason to reach them in the interest of justice. Were we to reach them, we would find that they are without merit. The count under which defendants were convicted properly charged them with a single crime *(cf., People v Keindl,* 68 NY2d 410), as defined by a single statutory section (Penal Law § 125.15 [1]). It did not, nor was it required to, specify the exact way in which each defendant committed the crime *(see, People v Charles,* 61 NY2d 321; *Bork v People,* 91 NY 5, 13). The court's charge, as based on the indictment, permitted the jury to find each defendant guilty of reckless manslaughter (Penal Law § 125.15 [1]) in any one of three alternate ways. The first consisted of having actually committed the reckless act leading to the death. The second and third each consisted of a criminal failure to perform a legally mandated duty, i.e., either having recklessly failed to prevent the other from harming Kwok-Wei, or having recklessly failed to obtain medical care.

Contrary to defendant's contention, neither the indictment nor the charge to the jury was improper for its failure to limit the jury's consideration to a single specific method by which each defendant could be held guilty of the crime. It is sometimes the case in prosecutions based in whole or in part on circumstantial evidence that precise details surrounding the crime must remain unknown. For example, a defendant may be charged and convicted on the alternate theories that he was either the principal actor or an accomplice, even though the People never prove which role he played *(see, People v Benzinger,* 36 NY2d 29, 34; *People v Hill,* 198 NY 64, 66). Similarly, where it is not possible to prove which defendant's act of violence actually caused the victim's death, each may at least be convicted of the attempted homicide *(cf., People v Dlugash,* 41 NY2d 725). Thus, in this case, as long as the circumstantial proof forecloses any reasonable hypothesis that each defendant played any role other than one of the three culpable roles above specified, each of which is consistent with guilt and inconsistent with innocence, defendants may not be exonerated by the fact that it does not establish precisely which role each one played.

However, while the prosecution was not obligated to demonstrate which defendant played what role in Kwok-Wei's death, in order to satisfy its burden of proof it was required to prove beyond a reasonable doubt that whichever defendant was not guilty by commission was guilty by omission, in that

he or she was aware of such facts as gave rise to a duty to act and he or she recklessly failed to do so, thereby causing the child's death. A close examination of the evidence shows that it does, in fact, foreclose any reasonable hypothesis concerning the events of the night in question other than that each defendant bore a culpable role in Kwok-Wei's death.

Initially, under the circumstances of this case, even if the proof had not demonstrated that each defendant was aware of the infant's injuries at the time they occurred *(but see,* discussion, *infra),* we find that each defendant's guilt of manslaughter in the second degree would still be overwhelmingly established in light of the evidence of the prior vicious acts of abuse perpetrated against other infants in this household as well as the evidence establishing that both defendants had been interviewed by a social worker concerning them, thereby establishing that the defendant who did not commit the prior acts of abuse was aware of them. The fact that the other defendant participated in the decision to continue the babysitting service and thereby allowed another infant to be exposed to such a risk demonstrates a blatant disregard for the welfare of the child. Furthermore, on the night in question, there is no question that both defendants were aware that the situation was one that was extremely likely to precipitate child abuse. Their statements established that Kwok-Wei had been crying continuously for two hours into the early morning hours. Under such circumstances, commonly known to be an exhausting, frustrating and emotionally wearing experience, to leave the child at the mercy of a known child abuser would be, without more, a conscious disregard of a substantial risk of death and a "gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). Moreover, medical testimony supports the conclusion that the shaking occurred near the end of this period, as the child would have gone into a coma within no more than 30 minutes of the trauma.

■ We note that such a finding does not, as the dissent argues, represent an impermissible reliance, in order to prove a defendant's guilt of the crime at issue, on evidence that he or she committed a prior crime or bad act. In this case, neither defendant could have been convicted on such an impermissible theory since there was no evidence as to which one had committed the prior acts. The inference that we draw from the prior acts of abuse concerns not the guilt of the active defendant, but the knowledge of the passive defendant,

i.e., that a person may be held criminally liable for entrusting a child to another person whose prior bad acts have demonstrated that to leave a child in his or her care is to put that child in substantial risk of death. Thus, even if the evidence had failed to demonstrate that the passive defendant was present and knew Kwok-Wei was being abused, that defendant's guilt of recklessly failing to perform the duty to prevent the other from harming Kwok-Wei would be established by the very fact of his or her failure to be present with the child at the time that the shaking occurred, i.e., after at least two hours of continuous crying, thereby consciously abandoning the child entrusted to his or her care to such a risk.

■ However, in this case, it is not necessary to rely on this theory, as much more was established. An examination of the evidence demonstrates that it proves beyond a reasonable doubt that each defendant must have been aware of the abuse at the time it occurred and that each contributed to causing the child's death. Initially, it should be pointed out that the jury was entitled to find, based on the expert testimony, that, for the very reasons that the shaking inflicted on this very young infant would necessarily have had to have been so violent so as to mandate a finding of recklessness as to the person who did it, it is clear that anyone who observed such conduct and failed to try to stop it, or, at least, seek immediate medical care, would share that mental state, since he or she would also, necessarily, have been aware of the substantial risk of death. Moreover, the expert testimony clearly established a causal link between this failure and the child's death, since it demonstrated that the child would probably have survived, had medical care been promptly provided.

Defendants, however, assert that such evidence is irrelevant since there was no evidence from which the jury could reasonably rule out the possibility that the injury could have been inflicted during the period they were both concededly awake between midnight and 2:00 to 2:30 A.M., at a point when one had left the room, or the possibility that, after they both went to bed, the baby started to cry again and was tended to by only one of them who, unbeknownst to the other, inflicted the fatal injury. Defendants thus argue that, if one of the defendants did not see the shaking, there was nothing to alert him or her to the risk of death or of a consequent duty to act and it was possible that the baby's subsequent lapse into coma could have been either unobserved completely or else reasonably interpreted as sleep.

Defendants' argument does not withstand the reasonable and logical inferences impelled by the evidence herein. First, given the physical characteristics of the small one-bedroom apartment and the child's presence in a crib abutting the bed where both defendants slept there is no "reasonable hypothesis of innocence" to be found in the absurd proposal that either defendant might have gone to bed and soundly slept while the other was reawakened by the child's crying and, without disturbing his or her sleeping spouse, proceeded to shake the baby to death. This compels the conclusion that the incident occurred prior to 2:00 A.M., when both acknowledge they were awake and with the baby.

Moreover, as to the claim that one of the defendants could have gone to bed after putting the child to bed innocently unaware that the baby was in a coma rather than asleep, the medical testimony by Dr. Miller demonstrated that the manner in which the baby's legs were flexed in the carrier indicated that rigor mortis had set in after the baby was placed there. Thus, when the police arrived he must have been in the carrier for hours rather than in the crib, where both defendants claimed he had been put when they went to bed and had been found, dead, in the morning.

Furthermore, a close examination of the record demonstrates that each defendant made certain other statements subsequent to the child's death which established that neither of them, as is now claimed, could have gone to bed oblivious to what had occurred and awakened to find to his or her shocked surprise that the baby was dead. The inescapable conclusion to be drawn from their statements is that they each became aware of the injury to the child at the time it happened, either by having caused it or having seen it occur, and later chose to disguise their culpability by claiming surprise.

Generally, evidence, such as false exculpatory statements, offered to prove consciousness of guilt is of weak probative value since there may be other reasons, such as fear of being wrongly accused, to cause a defendant to attempt to divert suspicion from himself or herself (see, People v Moses, 63 NY2d 299, 309). However, in this case, such evidence was not put forth merely as proof of a guilty conscience. Rather, such evidence constitutes proof that each defendant was aware that the child's death was a result of abuse before he or she could have gained such awareness innocently, i.e., when the autopsy was performed or the charges were brought (see, People v Benzinger, 36 NY2d 29). Since each defendant's false or con-

tradictory statements display an awareness of the culpable nature of the child's death well before such knowledge could have been innocently gained, this proof forecloses the possibility that either one, as claimed, was unaware of the injury at the time it happened.

First, as to Mrs. Wong, who held herself out to be a nurse, the evidence demonstrates that, when she spoke to Mrs. Jiang on the night after the baby died, she stated that there had been nothing wrong with the child the night before and that if she had taken him to the hospital the doctor would have "scold[ed]" her. This statement was completely contradicted by her later statement that she had seen that the baby was having cramps and was shaking involuntarily. Since both of these statements could not be true, this contradiction reveals that Mrs. Wong felt the need to prevaricate, which need could only have arisen from her awareness of how the baby died. Moreover, her transparent attempt to throw the blame elsewhere by indicating that it might have been Mrs. Jiang's consumption of birth control pills or herbal medicines that precipitated these symptoms in the child, and, impliedly, the baby's death, further demonstrates her awareness that either she or her husband had caused the child's death (see, People v Sims, 110 AD2d 214, 223-224, lv denied 67 NY2d 657, supra).

Furthermore, even earlier, her very first act of which we are aware on the morning of Kwok-Wei's death was to call the child's father, inform him that the child was dead and ask him to come to the apartment. She certainly would not have told him the child was dead unless she was certain of it, and, since the child was already in rigor mortis, there is no reason to believe that Mrs. Wong, with her nurse's training, would not have been fully aware that he was already dead. And yet, when she spoke to Mr. Jiang the second time, after she had been informed by the police that the child was dead, she stated to him that she did not know if he was dead and that he had been taken to the hospital in an ambulance. Once again, the mere fact of prevarication, in this case concerning her awareness of whether the baby was dead, reveals her knowledge that such awareness might be incriminating.

Although, unlike his wife, Mr. Wong never actually revealed his awareness on that morning that the child was dead, it is hardly reasonable to suppose that she could have been aware the child was dead without his also knowing of it. In light of this, the evidence reveals that he also displayed an eagerness to convey the impression that he did not believe the

child was dead but, rather, that he was in need of emergency medical treatment. When he called 911 he reported only that the baby was unconscious and needed an ambulance, and, when the police arrived, his immediate reaction was to tell them that he needed an ambulance, not the police.

Moreover, at the time of his arrest, Mr. Wong unwittingly eliminated any doubt of his own awareness of the way in which the baby had died by his statement to the arresting officer that they would eventually discover that the Wongs' three year old, whom he described as a little "Rambo," was the one who had injured the baby. As with the defendants' other statements, this comment was much more than merely a false exculpatory statement demonstrating consciousness of guilt. Rather, it was compelling circumstantial proof from which the only reasonable hypothesis which could be drawn was that Mr. Wong knew that the child had died of physical trauma, thereby establishing that he had either inflicted the injury or been present when the injury was inflicted.

For all of these reasons we find that the evidence established beyond a reasonable doubt that each of the defendants either caused the injuries or were aware of them at a time when he or she could have come to the child's aid and recklessly failed to do so, thereby causing the child's death.

■ As to defendants' additional contentions, we reject the argument that the prosecution was improperly allowed to introduce evidence concerning the other children who had been subjected to abuse while in defendants' care. This evidence was not only admissible to counter the defense that the injuries to Kwok-Wei had been accidental *(People v Henson,* 33 NY2d 63), but to demonstrate the recklessness of the passive defendant in leaving the child at the mercy of one who had previously committed acts of child abuse. Indeed, no impermissible prejudice could have ensued from the introduction of this evidence as to either defendant, since there was no proof as to which of the defendants had committed the prior acts. Thus, any implication that that person had a propensity to commit such a crime could not have contributed to the jury's finding that each of these defendants was guilty.

We find that the court's charge, when taken as a whole, properly explained to the jury the standards by which it was to judge the evidence as to the culpable mental state of each defendant. We also find that the prosecution's case in rebuttal was properly addressed to defendants' attempts to prove affir-

mative facts through the opinion testimony of its experts. *(See, People v Harris,* 57 NY2d 335, 344, *cert denied* 460 US 1047.)

Defendants' remaining contentions are not preserved for our review, and we find that they do not warrant review in the interest of justice.

Accordingly, the judgment of the Supreme Court, New York County (Clifford Scott, J.), rendered August 8, 1990, convicting defendants of manslaughter in the first and second degrees and endangering the welfare of a child, and sentencing them each to respective, concurrent terms of imprisonment of 8⅓ to 25 years, 5 to 15 years and 1 year, should be modified to vacate the convictions for manslaughter in the first degree, and should be otherwise affirmed.

MURPHY, P. J. (dissenting). The defendants, Eugene Wong and his wife Mary Wong, have been found guilty of manslaughter in the first and second degrees and endangering the welfare of a child. The theory of the prosecution was that one of the Wongs had shaken a 2½-month-old infant with sufficient force to cause fatal injury and that the other had witnessed the abuse without intervening to protect the child. It was additionally urged as a basis for imposing criminal liability that neither defendant had acted in the aftermath of the shaking to assure that the infant received prompt and, probably, life-saving medical attention. The Wongs had contracted to care for the child and it is said that the failure of one of the Wongs to shield the child from the other's abuse and the failure of both of them to obtain timely medical care for the infant constituted gross breaches of their contractually assumed duty, breaches so serious as to furnish a basis for criminal prosecution.

The prosecution's reliance upon a theory of liability in which guilt is premised largely upon nonfeasance as opposed to misfeasance arises not simply from the belief that the cited omissions of duty were criminal, but from necessity, for it is clear that it would have been impossible to prosecute either of the Wongs alone for having committed the acts by which the injuries to the infant were inflicted. This is because there was absolutely no proof indicating which defendant had shaken the child. It was then essential to the prosecution to advance a theory by which either defendant, assuming he or she to have been the passive party, might be found responsible for the crimes charged. I find it necessary to dissent for a number of reasons, the most basic of which is that I do not believe that

there was sufficient evidence to prove the guilt of the passive defendant and, lacking such evidence, the entire prosecution is rendered infirm.

The proof at trial established that in June 1988 Kwok-Wei Jiang, a 2½-month-old infant, was placed by his parents with the defendants who contracted to provide around-the-clock care for the child at their apartment six days a week. In the early morning of July 7, 1988 the child awoke crying. For 2 to 2½ hours thereafter the defendants attended the baby; they attempted to feed him and gave him a liquid dietary supplement called "gripe water" which had been left for him by his mother. According to the defendants, the child quieted down and was returned to his crib sometime between 2:00 and 2:30 in the morning. By daybreak, however, the child had died and at about 6:00 A.M. an ambulance was called for by Mr. Wong who claimed to have discovered the child dead in his crib just prior to summoning the ambulance. The police and ambulance attendants who responded to Mr. Wong's call found, on entering the Wong's apartment, that the baby had been placed in an infant carrier. Rigor mortis had set in indicating that the child had been dead for some time.

The baby was pronounced dead shortly after his arrival at the hospital. The cause of death, however, was not apparent, since, apart from a bruised area near the sacrum, there was no outward indication that the infant had been traumatized in any way, much less so severely as to cause death. The autopsy performed two days later revealed that the baby had suffered subdural and subarachnoid hemorrhages. The experts all shared the opinion that these hemorrhages were caused by vigorous shaking of the baby. They explained that when a young infant whose neck muscles are not yet sufficiently developed to support his or her head, is shaken, the head, if not supported externally, will rotate and flop from side to side. This motion causes the brain to impact forcefully against the interior of the child's hard skull and can cause the delicate blood vessels bridging the narrow space between the brain and the dura to rupture. Swelling of the brain and bleeding into the narrow subdural and subarachnoid spaces follows and, if the resulting pressure upon the vital centers of the brain is not alleviated through prompt medical intervention, the baby will eventually become comatose and die.

Shaken baby syndrome, as it has come to be called, was not recognized until the mid-1970's. It was only then that the potentially lethal consequences of shaking a very young infant

were scientifically documented and the processes producing the injuries associated with the syndrome were understood. It is still not known precisely how forceful or prolonged a shaking must be in order to cause injuries such as those sustained by Kwok-Wei Jiang. The testimony of the People's experts, however, indicated that while the force would have had to have been substantial, the injuries might have been produced in a very short space of time. Dr. Charlot, a pathologist from the Medical Examiner's office, testified that one shake might be sufficient to cause subdural bleeding.

Both prosecution and defense experts agreed that the vigorous shaking of an infant usually occurs as a response to an infant's seemingly incessant crying. The infant, then, comes to be shaken in a tragically misguided attempt by an often tired and otherwise stressed caretaker to pacify the child. And, indeed, following the shaking and the infliction of the above-described injuries, the objective of pacifying the child may seem to have been achieved. For, as the experts testified, although the child may continue to cry and be irritable immediately after the shaking, the infant soon becomes lethargic as he or she falls into unconsciousness. While it is possible, at this point, that a caretaker would, in trying to rouse an increasingly unresponsive infant, realize that something was very wrong, it is also possible that the circumstances prevailing in the aftermath of the shaking would militate against an early discovery of the seriousness of the infant's condition. If, after being shaken, the child, as she stops crying, is returned to her crib and not checked on the assumption that she is quietly sleeping, the gravity of the child's condition may not be discovered until it is too late. Dr. Daniel Kessler, one of the prosecution's experts, acknowledged as much during the following exchange.

"Q Doctor, let me give you a hypothetical of say an adult—as you say the most common incident is when a baby is crying—an adult goes over to quiet it, shakes it to quiet down and this happens between the hours of twelve to two in the morning, say in a home where a crib or bed would be near the adults, in the same room as the adult and its also at the time the adults are trying to sleep and the lights are out, would the adult be aware, able to observe that the child was damaged to the degree that you have indicated?

"A Well, again, under those circumstances the baby is becoming lethargic and the lights are out and the adult is not

visibly observing the child, yes, its possible for the adult not to be aware."

The majority has correctly concluded that the defendants' convictions for manslaughter in the first degree must be vacated. The reason for this, however, is not that the finding of intent to cause serious physical injury entailed by the verdict is against the weight of the evidence. Weight of the evidence analysis is appropriate only if there is legally sufficient evidence to sustain the verdict (see, People v Bleakley, 69 NY2d 490, 495) and here there is none. Even if it were assumed, contrary to the weight of the evidence, that the intention of the infant's shaker was not to quiet the child but to cause him serious physical injury, there is no proof from which it is possible to infer that the passive defendant shared that intent. And, since the evidence is insufficient to sustain a conviction of the passive defendant for first degree manslaughter, the conviction of both defendants on that count cannot stand; as noted, given the absence of any evidence as to who did what, neither defendant can be convicted except upon evidence establishing the guilt of both. The legal insufficiency of the evidence respecting the passive defendant renders the entire proof of manslaughter in the first degree legally deficient.

There are similar difficulties with the convictions for manslaughter in the second degree. That offense requires for its proof evidence establishing that the defendant inflicted the injury causing death recklessly (Penal Law § 125.15 [1]). "Recklessly" is defined in the Penal Law as follows: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." (Penal Law § 15.05 [3].)

It is, to begin, by no means clear that the defendant who shook Kwok-Wei Jiang was aware that the shaking posed a substantial risk of death. While it is generally known that a very young infant should not be vigorously shaken, the potentially lethal consequences of such a shaking are not so widely known. As noted, shaking was not identified as a discreet cause of infant mortality until the mid-1970's and there was no evidence presented at trial showing that, since then, the

very grave sequellae possible from the shaking of an infant had become a matter of common knowledge. More specifically, there was no evidence presented at trial that either defendant was in fact aware that the shaking of an infant could result in the infant's death. Nor was there evidence persuasively indicating that the active defendant would have understood from the child's reaction at the time of the shaking the extent of the injury being inflicted. Indeed, the People's rebuttal witness, Dr. Elizabeth Watkins, was able to state only "I suppose somebody *might* know what he or she was doing when they were very seriously harming" (emphasis added). Clearly, this was not sufficient to establish beyond a reasonable doubt that the active defendant was aware of, much less that he or she consciously disregarded, a substantial risk of death.

The difficulty of characterizing the action, or more accurately, inaction, of the passive defendant as reckless, is even more pronounced. Of course, all that has been said respecting the evidentiary deficiencies compromising the conviction of the active defendant applies with equal force to the passive defendant; there is no reason to suppose that the passive defendant's awareness of the risk of death was any greater than that of the active defendant. There is, however, a more substantial problem as to the proof of the passive defendant's recklessness which is that there is no evidence permitting the inference that the passive defendant had witnessed or had otherwise become aware of the shaking at or near the time of its occurrence. Obviously, there can be no question as to a defendant's awareness of a particular risk—here, the risk posed by the shaking—when it has not even been established that the defendant was aware of the circumstance or conduct from which the risk proceeded.

The majority reasons that the passive defendant must have witnessed the shaking because the defendants admitted being awake and in attendance on the infant between 12:00 and 2:30 A.M. It is urged that the shaking must have occurred within this interval, and the infant's death not long thereafter, in order for rigor mortis to have set in, as it did, by 6:30 A.M. Leaving aside, however, that not one witness was able to state the time of the infant's death or offer anything more than a "ballpark figure" as to how long after the infant's death it was that rigor mortis did, in fact, set in, the circumstances upon which the majority premises its inference as to the passive defendant's awareness of the shaking simply do not require that inference. Put differently, they do not discount hypoth-

eses consistent with the passive defendant's innocence, the simplest of which is that the passive defendant was momentarily absent from the room during the time the infant was shaken. Surely, it is not at all improbable that, during the 2½-hour period in question, the passive defendant from time to time left the room where the baby was being attended in order, for example, to use the bathroom or prepare a bottle for the infant in the kitchen, or to attend to some need of the defendants' three-year-old son. It is basic that where, as here, the evidence offered in support of a criminal conviction is entirely circumstantial it must exclude to a moral certainty all hypotheses consistent with a defendant's innocence *(People v Bearden,* 290 NY 478, 480; *People v Cleague,* 22 NY2d 363, 365-366; *People v Montanez,* 41 NY2d 53, 57; *People v Way,* 59 NY2d 361, 365; *People v Sanchez,* 61 NY2d 1022, 1024), indeed that "Circumstantial evidence 'is of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt' " *(People v Montanez, supra,* at 57, citing *People v Suffern,* 267 NY 115, 127). Plainly, this very exacting standard has not been met here or, as will be seen, at numerous other critical inferential junctures in this case.

The majority's fallback argument that even if the passive defendant was not contemporaneously aware that the infant had been shaken, he or she is still culpable for having left the infant in the care of a known child abuser, is simply not tenable. The issue in this case, is not, as the majority suggests, whether, given a history suggestive of prior abusive behavior towards children in their care, it was an exercise in good judgment for the defendants to have assumed additional child-care responsibilities, or even whether their judgment in doing so was so palpably poor as to constitute recklessness as that term is generally understood. The defendants have not been convicted of poor judgment or recklessness per se but of manslaughter in the second degree which, as noted, requires for its proof evidence that the defendants consciously disregarded a substantial risk of death. What the majority argues then, is that if the passive defendant at any point during the night in question left the infant alone with the active defendant, even momentarily, that act evinced a conscious disregard of a substantial risk of death. The factual premise for this argument is that, as the trial evidence showed, on two prior occasions children in the defendants' care sustained injuries which may have resulted from abuse. It is thus urged that the passive defendant, knowing that children had been

physically abused within the Wong household, must have known that the active defendant was the abuser and that to leave a child with this person for any length of time, however brief, raised a substantial possibility that the child would not only be abused, but killed. As the majority itself points out, however, "there was no proof as to which of the defendants had committed the prior acts". In the absence of such proof, it remains entirely possible that it was the passive rather than the active defendant who had been responsible for the prior abuse, if indeed abuse had occurred, and that the passive defendant did not, therefore, consciously disregard any demonstrated propensity on the part of the active defendant to abuse children. Moreover, the extent to which the prior incidents were indicative of active abusiveness as opposed to neglect or accident or some combination of the three is far from clear on this record. Thus, even if the active defendant was in some measure responsible for the prior incidents, it is by no means evident that the passive defendant would or should have understood his or her conduct as indicative of a general propensity to harm children so pronounced as to make it criminally reckless to leave a child with that defendant for any length of time. The Wongs did, after all, have a three-year-old son who concededly showed no signs of abuse and, for all that is known, the Wongs may have cared for many other children without incident.

Indeed, it was undoubtedly in recognition of the danger of drawing what could only, given the very limited and equivocal evidence, have been highly speculative conclusions as to the abusive propensities of the defendants, that the court repeatedly instructed the jury that the evidence of the prior incidents was not admitted and was not to be considered for the purpose of showing that the defendants were predisposed to abuse children. The court stated:

"I have allowed the people to introduce evidence that on one occasion—there would be another occasion—that some incident or act occurred with reference to injury to children and this is not to show that these defendants had any predisposition to commit these acts but merely to show that the [sic] was no claim of mistake or accident.

"You understand what I am saying?

"It is not to show that they are inclined to injure these children but it shows it wasn't accidental or a mistake."

And, in its main charge the court would again instruct the

jury that the evidence of the prior occasions in which children sustained injuries while in the defendants' care was "no proof whatever that one or both (defendants) possessed a propensity or disposition to commit the crimes charged in this case." The court continued, "It (the evidence of prior possible abuse) is not offered for such a purpose and must not be considered by you for that purpose. Instead the People offer such evidence of these prior instances solely for the purpose of nullifying the claim of mistake or accident. I instruct you that such evidence may be considered by you only for such limited purpose and for no other." Given the clarity of these instructions and the law governing the use of evidence of other crimes, and, indeed, the absence of any propensity argument in the People's appellate presentation, it is somewhat puzzling to see such an argument now made by the majority. For when the majority urges that the passive defendant's knowledge of prior instances of possible child abuse within the defendants' household rendered the passive defendant's conduct culpable, it is using the evidence of the prior incidents in precisely the manner forbidden the jury, namely, as evidence of criminal propensity. It is saying that the passive defendant must have known of the substantial danger that the active defendant would kill the child left in his or her care because the active defendant had demonstrated a propensity to behave viciously toward children. While the evidence of the prior incidents may have been admissible to show that, contrary to the theory of the defense at trial, the injuries sustained by Kwok-Wei Jiang were not accidentally inflicted by the defendants' three-year-old son, it is clear that the evidence was not competent or admissible or, indeed, admitted as proof of the active defendant's propensities. If an appellate court from its detached perspective cannot properly confine its use of evidence to the very limited ends for which it was received, a most serious question arises as to whether the jury was capable of doing so, and, if not, whether the probative value of the evidence was not outweighed by its prejudicial effect (see, People v Alvino, 71 NY2d 233, 242; see also, People v Montanez, supra, at 58).

Returning now to the scenario wherein the passive defendant is said to have witnessed the shaking, and admitting for purposes of argument what the People failed to prove, i.e., that the passive defendant did, in fact, witness the shaking, the proof of guilt remains incomplete without evidence that the passive defendant could have stopped the shaking. Here

again, without any evidence of how the shaking occurred, it is impossible to say whether the passive defendant could have prevailed upon the shaker to stop. Given the paucity of proof, there is no way of discounting the very real possibility, indeed probability, that the shaker acted impulsively and without warning leaving the passive defendant no opportunity to prevent the shaking. And, given the testimony of the People's expert witness that the fatal injury could have been inflicted with as little as one vigorous shake, a very significant question is raised as to whether the passive defendant had any chance to intercede before the injury had become a fait accompli.

There is, finally, the question as to whether the passive defendant acted with conscious disregard of a substantial risk that the infant in his or her care would die, when he or she failed to obtain prompt medical care in the aftermath of the shaking. Of course, if the passive defendant had not been aware that the infant had been shaken, no duty to obtain medical assistance would have arisen unless there had been ensuing signs of distress which themselves would have alerted the passive defendant to the need for emergency medical care. Indeed, even if the passive defendant had witnessed or otherwise learned of the shaking there would still remain a large question as to whether the duty to obtain medical assistance would have arisen absent some unusually pronounced and alarming reaction to the shaking. Moreover, the issue presented is not simply whether there was a duty to obtain medical care, but whether the failure of the passive defendant to have done so renders that defendant liable for manslaughter on a theory of recklessness. As discussed above, shaken baby syndrome is a relatively rare and only fairly recently recognized and understood phenomenon. The record discloses no general or specific ground to suppose that the defendants knew of it or were otherwise aware that the shaking of an infant, unaccompanied by other trauma, posed a substantial risk of fatality. What then were the sequellae of the shaking that were to have placed the defendants on notice that if medical care was not promptly obtained, the baby could very well die?

There is, of course, no direct evidence indicating what, if any, signs of distress the baby exhibited following the shaking. The only evidence on this point came from the medical experts who, as noted, *supra,* stated that the baby probably would have cried for a short period and would then have become lethargic and increasingly unresponsive. While the

baby's unresponsiveness might have alerted its caretaker(s) to the need for medical intervention, it was specifically acknowledged in the aforecited testimony of the People's witness that, in circumstances such as those likely to have prevailed following the shaking of Kwok-Wei Jiang, the baby's unresponsiveness might very well have gone undetected. When all is said and done, nothing in the trial evidence excludes the possibility that the child was shaken with no more malefic purpose than that of stopping him from crying and that when, within minutes of the shaking, the child did in fact become quiet and lethargic, the defendants returned the child to his crib on the tragically mistaken, but not culpable, assumption that the child was drifting back to sleep. While this hypothesis remains viable, it simply cannot be said that there was, in this entirely circumstantial case, sufficient proof that the defendants were aware of, much less disregarded, a risk of death "of such nature and degree that disregard thereof constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). Plainly, in order to constitute a predicate for a conviction of manslaughter in the second degree the consciously disregarded risk of death must be shown to have been absolutely clear. To sustain a conviction on evidence such as that at bar leaving significant doubt as to the obviousness both of the risk and its extent, unacceptably reduces the threshold for a criminal conviction on a recklessness theory.

Since, for all of the aforementioned reasons, the evidence was insufficient to permit the conviction of the passive defendant for reckless manslaughter it follows, also for reasons previously discussed, that the second degree manslaughter counts against both defendants must be dismissed. Also requiring dismissal are the remaining counts in the indictment charging the defendants with endangering the welfare of a child (Penal Law § 260.10 [1]). Although the evidence is certainly sufficient to show that the active defendant, i.e., the shaker, knowingly acted in a manner likely to be injurious to the physical welfare of Kwok-Wei Jiang, the proof is once again insufficient to show that the cited omissions of the passive defendant were culpable. And, as with the manslaughter counts, the insufficiency of the evidence as against the passive defendant renders a conviction of either defendant impossible to sustain.

The conclusion that the indictment must be dismissed is, of course, premised upon the existence of critical deficiencies in

the proof, deficiencies which are not in any measure ameliorated by the statements of the defendants upon which the People and the majority place such emphasis. It is said that these statements, made by the defendants subsequent to the infant's death but before the cause of death had been made a matter of record as a result of the autopsy, indicate that the defendants possessed knowledge of the way in which the injuries were inflicted at a time when such knowledge could not have been innocently acquired. But plainly this is incorrect, for it would seem obvious that such knowledge might have been innocently obtained by either of the Wongs from the other at any time subsequent to the infant's death. Moreover, contrary to the majority, none of these statements may be fairly construed as demonstrating the defendants' awareness of the manner in which the infant had been injured or as being otherwise indicative of guilt of the crimes charged. As the majority points out, evidence offered to prove consciousness of guilt is generally of weak probative value (see, People v Moses, 63 NY2d 299, 308-309), and certainly the statements here at issue, the substance of which is detailed in the majority memorandum, do not prove exceptions to this rule. The issue presented is not whether the statements reflect some sense of responsibility on the part of the defendants for what happened or whether the statements were admirable, but whether they may be treated, as they have been by the majority, as virtual admissions of criminality. If the defendants felt guilty in a general way for the death of the child left in their care, that would have been unremarkable, even if they had not been responsible for the child's demise. Nor would it have been remarkable, given the enormity of what had transpired, for the defendants to have manifested such feelings of guilt in a defensive, awkward and not altogether consistent way. As noted, however, the issue in evaluating these statements is not whether they betray a guilty conscience, which they very well may, but whether they are probative of the defendants' guilt of the specific crimes charged. Of the several statements cited by the majority there is only one that would seem to possess even a modicum of probative worth, and that is Mrs. Wong's acknowledgment that she had observed the infant cramping and shaking involuntarily. If there was any indication that Mrs. Wong had made these observations on the night of July 7, 1988 subsequent to the shaking, the statement would certainly be probative, although not dispositively so, of whether Mrs. Wong had

been aware of the magnitude of the risk to the baby's life. A careful examination of the record, however, shows that Mrs. Wong's statement of her observations, as related by the infant's mother, did not purport to reflect the infant's condition during the crucial interval between the shaking and the infant's death and that it, like the other statements is probative of little, if anything.

It hardly needs saying that this is an excruciatingly difficult case. A child has died, and it would appear clear that his death is attributable to mistreatment at the hands of at least one of the two people who undertook to care for him. The attempt to assign criminal responsibility for the child's death is thus entirely understandable. But the appearance of a wrong, even a very great wrong, is not enough to sustain a criminal conviction. For that, evidence is needed, not simply of conduct improvident or offensive, but of the specific crimes charged and the identity of those who committed them. Although it is easy to wish it were otherwise, the evidence in this case simply did not show with the requisite certainty that the crime of manslaughter in either the first or second degree had been committed, nor did it show who had endangered the child's physical welfare, and surely no one would suggest that the conviction of two people was justified for any crime, no matter how loathsome, upon evidence sufficient to show no more than that one or the other was guilty.

Accordingly, the judgment of the Supreme Court, New York County (Clifford Scott, J.), rendered August 8, 1990, convicting defendants of manslaughter in the first and second degrees and endangering the welfare of a child, and sentencing them each to respective, concurrent terms of imprisonment of 8⅓ to 25 years, 5 to 15 years, and 1 year, should be reversed and the indictment dismissed.

CARRO, ELLERIN and KASSAL, JJ., concur; MURPHY, P. J., and ASCH, J., dissent in a separate opinion by MURPHY, P. J.

Judgment, Supreme Court, New York County, rendered on August 8, 1990, modified to vacate the convictions for manslaughter in the first degree, and otherwise affirmed.